IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL FEHRENBACHER, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 24-cv-04740 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| UNITEDHEALTHCARE INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Michael Fehrenbacher and M&M Financial & Insurance Agency, Inc. ("M&M") sold Defendant UnitedHealthcare Insurance Company's ("UHC") insurance products until UHC terminated them, purportedly for cause. In particular, UHC contended that it had cause to terminate Plaintiffs based on an investigation that revealed Fehrenbacher had been forging applicants' signatures on insurance applications. Fehrenbacher, however, claims that UHC falsely accused him of forgery to retaliate against him for reporting certain misconduct on the part of UHC. For that reason, Plaintiffs have brought the present action asserting claims for breach of contract and defamation *per se*. UHC responded to Plaintiffs' compliant by filing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 8.) After UHC's motion was fully briefed, Plaintiffs filed a motion for leave to file a First Amended Complaint ("FAC") and to vacate the stay of discovery. (Dkt. No. 22.) For the reasons that follow, UHC's motion to dismiss is denied and Plaintiffs' motion for leave to file an FAC and to vacate the stay of discovery is granted.

**BACKGROUND**

For the purposes of the motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and views those facts in the light most favorable to Plaintiffs as the non-moving parties. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The complaint alleges as follows.

Michael Fehrenbacher is a licensed insurance agent based in Illinois. (Compl. ¶ 1, Dkt. No. 1-1.) In September 2018, Fehrenbacher and UHC entered into an agreement under which Fehrenbacher would sell UHC's Medicare Advantage ("MA") plans and other UHC insurance products to Illinois consumers, and UHC would pay Fehrenbacher commissions on those sales ("Agreement"). (*Id.* ¶¶ 4–5.) Then, in September 2020, Fehrenbacher assigned to M&M all his rights to commissions due under his agreement with UHC ("Assignment"). (Compl. ¶ 6; Pls.' Opp'n to Mot. to Dismiss, Ex. A at 189, Assignment, Dkt. No. 17-1.[1]) Following the Assignment, Fehrenbacher, as an agent of M&M, continued selling UHC insurance products. (Compl. ¶¶ 7–8.) However, on June 12, 2023, UHC terminated its Agreement with Fehrenbacher for cause, claiming that "[a]n internal investigation found multiple enrollees attested that the signatures on applications [Fehrenbacher] submitted for them were not theirs." (Compl. ¶ 9; Pls.' Opp'n to Mot. to Dismiss, Ex. A at 245, Termination Letter.)

According to Fehrenbacher, UHC made up its claim that Fehrenbacher was forging applicants' signatures to retaliate against him for notifying UHC employees of his concern that UHC had been inappropriately soliciting his clients. (Compl. ¶¶ 16–18, 21.) Specifically, several of Fehrenbacher's clients told him in late 2022 that UHC had solicited them to switch from their

---

[1] The version of the removed state-court complaint attached to the notice of removal in this case did not include the complaint's exhibits. Thus, Plaintiffs include as an exhibit to their response brief both the complaint and its exhibits.

free Veterans Affairs' primary healthcare coverage to a private UHC plan. (*Id.* ¶ 16.) Because those solicitations ran afoul of federal regulations, Fehrenbacher contacted UHC to report the misconduct. (*Id.* ¶¶ 17–18.) After terminating Fehrenbacher, UHC began issuing written statements to several state agencies falsely accusing Fehrenbacher of forging signatures on multiple insurance applications and other fraudulent acts. (*Id.* ¶¶ 19, 23.)

Based on its labeling of Fehrenbacher's termination as for cause, UHC has refused to pay the approximately $1.7 million in commissions it owes pursuant to the Agreement. (*Id.* ¶ 14.) Fehrenbacher denies committing any forgery, claiming his termination can only be deemed to be without cause such that UHC must pay the full $1.7 million it owes. (*Id.* ¶¶ 10–11, 13–14.) Therefore, he and M&M brought the present action, with both Plaintiffs asserting a breach-of-contract claim against UHC. Moreover, because Fehrenbacher contends that the statements UHC submitted to various state agencies accusing him of forgery were categorically false, he also asserts a claim of defamation *per se* against UHC.

## DISCUSSION

While Plaintiffs' proposed FAC would assert new claims for tortious interference with a business expectancy and tortious interference with contract, it also adds allegations to bolster the existing claims in the presently operative complaint. Thus, the Court will begin by considering the viability of the current complaint's allegations before turning to address Plaintiffs' motion for leave to amend.

### I. Motion to Dismiss

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual

allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). UHC moves to dismiss the complaint in its entirety.

### A. Breach of Contract

Both Plaintiffs assert a breach of contract claim against UHC. Yet UHC argues that, by referring to Plaintiffs collectively, the complaint fails to adequately plead a claim as to either. The Court disagrees. "Group pleading" is not strictly forbidden by the Federal Rules of Civil Procedure, as what matters is whether "the complaint provides sufficient detail to put the defendants on notice of the claims." *Robles v. City of Chicago*, 354 F. Supp. 3d 873, 875 (N.D. Ill. 2019). Here, the complaint provides adequate notice that Fehrenbacher's claim is based on UHC's alleged breach of the Agreement and that M&M's claim arises out of the Assignment.

Next, UHC contends that Fehrenbacher does not actually have a claim against it for breach of contract because he executed the Assignment assigning his rights under the Agreement to M&M and the Agreement was later updated to substitute M&M for Fehrenbacher. Curiously, Plaintiffs do not dispute this version of the facts even though the Court does not find them supported by either the complaint's allegations or its attached exhibits. All the complaint alleges is that "Fehrenbacher executed [the Assignment] to M&M" and then, in 2021, "UHC signed an updated agent agreement." The Assignment, by its very terms, provides only that Fehrenbacher assigned to M&M his "right, title, interest, claim or demand in and to any and all compensation now due and payable, or which may become due and payable, under existing contracts and agreements." (Assignment.) And while the complaint attaches an exhibit purporting to be an updated version of the Agreement, that exhibit contains only blanks where the name of UHC's

4

agent is to be listed and is signed only by UHC. (Pls.' Opp'n to Mot. to Dismiss, Ex. A at 191–211.) Notably, the Termination Letter's salutation is addressed directly to Fehrenbacher and goes on to provide "notice that your . . . Agreement with [UHC] . . . and your appointment with [UHC] have been terminated for cause." (Termination Letter.)

Although Fehrenbacher assigned his right to commissions to M&M, neither the complaint's allegations nor its exhibits suggest that UHC's other obligations to Fehrenbacher were displaced. One of those obligations was that, upon termination without cause, "all commissions that had been earned" up to that point "became vested and payable." (Compl. ¶ 11.) The complaint then goes on to allege that there was no basis for Fehrenbacher's termination[2] and therefore UHC breached the Agreement by failing to pay the commissions due and owing. (*Id.* ¶¶ 10, 12–14.) Together, those allegations suffice to state a breach of contract claim as to Fehrenbacher. And because the complaint alleges that M&M was assigned all rights to Fehrenbacher's commissions, M&M has a viable breach of contract claim against UHC based on its failure to pay the commissions owed under the Agreement. *See, e.g.*, *Kaplan v. Shure Bros., Inc.*, 266 F.3d 598, 602 (7th Cir. 2001) ("Privity accompanies the valid assignment of rights under a contract because it puts the assignee in the shoes of the assignor—because the assignor was in privity with the opposite contracting party, so is the assignee." (internal quotation marks omitted)); *Etransmedia Tech., Inc. v. Allscripts Healthcare, LLC*, 448 F. Supp. 3d 910, 914 (N.D. Ill. 2019) ("[W]hen a party partially assigns the right to a claim, the assignor and the

---

[2] In its reply brief, UHC asserts that the Court should not credit Plaintiffs' contention that UHC lacked cause to terminate Fehrenbacher given that the Termination Letter showed that UHC had determined that Fehrenbacher forged signatures on insurance applications. That argument is specious, as it would require the Court to accept the truth of UHC's proffered grounds for terminating Fehrenbacher while ignoring the complaint's many allegations about the false and defamatory nature of the forgery accusation. Essentially, UHC would have the Court to invert the standard of review for a motion to dismiss and view the allegations in the light most favorable to UHC rather than Plaintiffs.

assignee each retain an interest in the claim and are both real parties in interest." (internal quotation marks omitted)).³ Accordingly, UHC's motion to dismiss Plaintiffs' breach-of-contract claims is denied.

### B. Defamation *Per Se*

Turning to Fehrenbacher's defamation *per se* claim, in Illinois, a "statement is considered defamatory if it tends to cause such harm to the reputation of another that it lowers the person in the eyes of the community or deters third persons from associating with [him]." *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1214 (Ill. 1996). To state a defamation claim, a plaintiff must allege facts showing: (1) a false statement by the defendant about the plaintiff; (2) the defendant made an unprivileged publication of that statement to a third party; and (3) that publication caused damages. *Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 839 (Ill. 2006). A defamatory statement is actionable *per se* where "its harm is obvious and apparent on its face." *Id.* Illinois recognizes five categories of statements considered defamatory *per se*:

> (1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication.

*Id.*

---

³ The Court observes that there is a question as to which state's law governs the contract claims here. (*See* Pls.' Opp'n to Mot. to Dismiss, Ex. A at 26 § 6.8 (providing that the Agreement shall be construed under Minnesota law).) However, Plaintiffs assume that Illinois law governs, and UHC does not address the matter. The Court takes no position on the choice-of-law issue at this stage and concludes only that the allegations supporting the breach-of-contract claims suffice under federal notice pleading standards—they give UHC "fair notice of the claim for relief and show the claim has 'substantive plausibility.'" *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 517 (7th Cir. 2015) (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam)).

Here, UHC does not deny that its alleged statements accusing Fehrenbacher of forging applicant signatures are defamatory *per se* in that they suggest that Fehrenbacher lacks integrity in performing his employment duties. Nonetheless, UHC contends that Fehrenbacher's defamation *per se* claim must be dismissed for multiple reasons. Specifically, UHC argues that the defamation claim is preempted by the Medicare Act, 42 U.S.C. § 1395 *et seq.*, that it was absolutely privileged to publish the purportedly defamatory statement, that the claim is barred under Illinois's economic loss doctrine, and that the claim is time-barred under the applicable statute of limitations. The Court addresses each contention in turn.

1. *Preemption*

UHC first argues that Fehrenbacher's defamation claim is expressly preempted by the Medicare Act. "Express preemption occurs when a federal statute explicitly states that it overrides state or local law." *Hoagland v. Town of Clear Lake*, 415 F.3d 693, 696 (7th Cir. 2005). Part C of the Medicare Act contains a broad express preemption provision. *MD Spine Sols., LLC v. UnitedHealth Grp., Inc.*, No. 21 C 3435, 2022 WL 124160, at *2 (N.D. Ill. Jan. 13, 2022). Specifically, the Medicare Act provides that "[t]he standards established under [Part C] shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under [Part C]." 42 U.S.C. § 1395w-26(b)(3). Most courts have understood this provision also to preempt state common law claims. *E.g.*, *Rudek v. Presence Our Lady of Resurrection Med. Ctr.*, No. 13 C 06022, 2014 WL 5441845, at *4 (N.D. Ill. Oct. 27, 2014).

Although the Seventh Circuit has not yet addressed the scope of the Medicare Act's preemption, other Courts of Appeals have interpreted the statute to preempt "not just state law claims that conflict with the federal regulatory scheme, but also state law claims that 'parallel, enforce, or supplement express standards established under Part C and its implementing

7

regulation.'" *Ahmad v. UnitedHealth Grp. Inc.*, No. 8:23-cv-02303-MRA-DFM, 2025 WL 1271922, at *4 (C.D. Cal. Mar. 28, 2025) (quoting *Aylward v. SelectHealth, Inc.*, 35 F.4th 673, 681 (9th Cir. 2022)); *see also Rudek*, 2014 WL 5441845, at *4 (observing that the Medicare Act's "preemption provision applies to 'any' state law or regulation, not just those that are inconsistent with federal standards"). Put another way, the Medicare Act will preempt those state laws that "occupy the same 'place'— that is, that regulate the same subject matter as—federal Medicare Part [C] standards." *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 971 (8th Cir. 2021).[4] Thus, courts generally find preemption under the Medicare Act "when (1) Congress or [federal regulations] ha[ve] established 'standards' in the area regulated by the state law; and (2) the state law 'acts with respect to' those standards." *King County v. Express Scripts, Inc.*, No. 24-cv-49-BJR, 2025 WL 1082130, at *9 (W.D. Wash. Apr. 10, 2025).

The first step of the preemption inquiry requires the Court to "identify whether there is a relevant standard established under Part C with preemptive effect." *Aylward*, 35 F.4th at 680 (internal quotation marks omitted). As used in the preemption provision, "standard" has been understood to mean "a [Medicare Part C] statutory provision or regulation promulgated under [Medicare Part C] and published in the Code of Federal Regulations." *Wehbi*, 18 F.4th at 971. As UHC is quick to point out, there are federal regulations imposing obligations on "an MA organization [that] uses agents and brokers to sell its Medicare plans." 42 C.F.R. § 422.2274. Among other things, those regulations provide that "MA organizations must oversee first tier, downstream, and related entities that represent the MA organization to ensure agents and brokers

---

[4] *Wehbi* discusses preemption under Medicare Part D. However, Medicare Part D incorporates by reference Medicare Part C's express preemption provision. 42 U.S.C. § 1395w-112(g). Thus, when decisions like *Wehbi* discuss preemption under Medicare Part D, they are interpreting the language of Part C's preemption provision such that the analysis from those cases is equally applicable to Part C cases.

8

abide by all applicable State and Federal laws, regulations, and requirements." *Id.* § 422.2274(c). And, particularly relevant to the circumstances here, 42 U.S.C. § 422.2274(c)(2) provides that an MA organization must, "[a]s required under applicable State law, report the termination of an agent or broker to the State and the reason for termination."

According to UHC, because § 422.2274(c)(2) establishes a standard governing the exact conduct of which Fehrenbacher complains here—*i.e.*, reporting the fact of and reasons for Fehrenbacher's termination to state agencies—it necessarily preempts his defamation claim. The Court disagrees. Although § 422.2274(c)(2) establishes a standard concerning an MA organization's duties when it terminates an agent or broker, that standard cannot be deemed a federal standard. *See Hepstall v. Humana Health Plan, Inc.*, No. 18-0163-JB-MU, 2018 WL 6588555, at *6 (N.D. Ala. Nov. 26, 2018) (summarizing decisions regarding Medicare Act preemption as finding preemption where "the conduct underlying the plaintiffs' allegations and state law claims was governed by federal regulatory standards"). On the contrary, the regulation's express language directs the MA organization to report "[as] required under applicable State law." It is difficult to see how a regulation that essentially commands MA organizations to follow state law in reporting agent and broker terminations somehow overrides state law. Moreover, the referenced state laws concerning an MA organization's reporting requirements implicate the state licensing laws that are expressly carved out from the scope of the Medicare Act's preemption provision. And § 422.2274(c)'s requirements were promulgated in service of its express purpose of imposing upon an MA organization an oversight responsibility "to ensure agents and brokers abide by all applicable *State* and Federal laws, regulations, and requirements." 42 C.F.R. § 422.2274(c) (emphasis added).

9

In short, § 422.2274(c)(2) simply directs an MA organization like UHC to comply with the state licensing laws that the Medicare Act's preemption provision does not claim to supersede. That regulation is not a federal standard with preemptive effect under the Medicare Act. For that reason, the Court rejects UHC's contention that the Medicare Act preempts Fehrenbacher's defamation *per se* claim.

### 2. *Absolute Privilege*

One element of a defamation claim requires a plaintiff to plead that the defendant made an unprivileged publication of the defamatory statement. However, UHC asserts that its statements accusing Fehrenbacher of forgery were compelled by law and therefore its publication was absolutely privileged. Specifically, UHC notes that the complaint alleges that it published the purportedly defamatory statements to state agencies in Minnesota and North Carolina. (Compl. ¶ 23.) In both of those states, an insurer is required by law to provide the relevant state agency with a statement describing its reasons for terminating an agent based on certain types of misconduct. N.C. Gen. Stat. § 58-33-56(a) ("An insurer . . . that terminates the appointment, employment, contract, or other insurance business relationship with a producer or limited representative shall notify the Commissioner within 30 days . . . using a form prescribed by the Commissioner, if the reason for termination is for or related to one of the causes listed . . . ."); Minn. R. 2795.1600 ("An insurer or agency which terminates an agent's appointment, or its contract or association with an agent based entirely or in part on a complaint or alleged violation of law . . . must, within ten working days of the termination, forward to the commissioner a written statement of reasons for the termination.").

Under Illinois law, "[a] communication is absolutely privileged when its propagation is so much in the public interest that the publisher should speak fully and fearlessly." *Anderson v. Beach*, 897 N.E.2d 361, 365 (Ill. App. Ct. 2008) (internal quotation marks omitted). When

applicable, "[a]n absolute privilege provides a complete immunity from civil action even though the statements were made with malice because public policy favors the free and unhindered flow of such information." *Zych v. Tucker*, 844 N.E.2d 1004, 1008 (Ill. App. Ct. 2006). Given the complete immunity from liability the privilege affords, "[a]bsolutely privileged communications are rare." *Anderson*, 897 N.E.2d at 366. But even where a statement is not absolutely privileged, it may nonetheless be protected by a qualified privilege whereby "the person making the statement is immune from liability unless some element, such as malice, is present." *Razavi v. Sch. of the Art Inst. of Chi.*, 122 N.E.3d 361, 368 (Ill. App. Ct. 2018).

UHC is correct that Illinois courts have recognized that "[o]ne who is required by law to publish defamatory matter is absolutely privileged to publish it," but those courts also have qualified that general principle by recognizing that, "[i]n the case of a private citizen [as opposed to a public official], the privilege arising from the legal duty is always conditional." *Dawson v. N.Y. Life Ins. Co.*, 932 F. Supp. 1509, 1538 (N.D. Ill. 1996) (quoting Restatement (Second) of Torts §§ 592A, 595 cmt. f (1977)); *see also Weber v. Cueto*, 568 N.E.2d 513, 517 (Ill. App. Ct. 1991) ("The class of absolutely privileged communications is narrow and is practically limited to legislative and judicial proceedings and **other acts of State**, including communications made in the discharge of a duty under express authority of law." (emphasis added) (internal quotation marks omitted)). Thus, the Court finds that any privilege that may attach to UHC's purportedly defamatory statements to state agencies about the reasons for Fehrenbacher's termination would be a qualified privilege. Indeed, the Seventh Circuit reached the same conclusion when addressing a substantially similar reporting requirement with respect to securities brokers. In *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 705 (7th Cir. 1994), the Seventh Circuit considered whether the absolute privilege covered a securities firm's statements made in

11

compliance with a rule requiring members of the National Association of Securities Dealers to submit a termination notice that listed the reason for a broker's termination. The Seventh Circuit declined to grant an absolute privilege to such statements, in part, because doing so "would be tantamount to allowing a member of the [National Association of Securities Dealers] to blackball a former employee from employment throughout the large sector of the industry that the membership of the association constitutes." *Id.* at 708. That same logic applies here, where it is alleged that UHC, under the guise of an internal investigation, concocted a false and defamatory reason for terminating Fehrenbacher's employment and then published that statement to multiple state agencies, thereby jeopardizing Fehrenbacher's livelihood as an insurance agent.

Finding only a qualified privilege is also in accord with an Illinois Supreme Court decision that "considered a letter sent by an insurer to an insured explaining the reason for the denial [that was] 'sent because of a legal duty'" and was treated "as conditionally—not absolutely—privileged." *Dawson*, 932 F. Supp. at 1538–39 (quoting *Kuwik v. Starmark Star Mktg. & Admin, Inc.*, 619 N.E.2d 129, 135 (Ill. 1993)). And the Court's conclusion is reinforced by the fact that one of the state laws that UHC claims required it to publish the statements about Fehrenbacher explicitly protects an insurer from "civil liability as a result of any statement or information provided" but only "[in] the absence of actual malice." N.C. Gen. Stat. § 58-33-56(f). To be sure, a qualified privilege offers UHC some protection with respect to its reports to state agencies, but such a privilege is lost if, as alleged here, UHC acts with malice. *Baravati*, F.3d at 708. In any case, UHC seeks dismissal only on absolute rather qualified privilege grounds. Since UHC was not absolutely privileged in communicating the reasons for Fehrenbacher's termination to state agencies, the Court will not dismiss the defamation *per se* claim on that basis.

### 3. *Economic Loss Doctrine*

Next, UHC argues that Fehrenbacher's defamation *per se* claim must be dismissed because it simply recasts as a tort claim the allegations giving rise to his claim for breach of the Agreement, such that any potential recovery is barred by the economic loss doctrine. Under Illinois law, the economic loss doctrine provides that a "plaintiff cannot recover for solely economic loss under the tort theories of strict liability, negligence and innocent misrepresentation." *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 453 (Ill. 1982). "In essence, the economic loss, or commercial loss, doctrine denies a remedy in tort to a party whose complaint is rooted in disappointed contractual or commercial expectations." *Sienna Ct. Condo. Ass'n v. Champion Aluminum Corp.*, 129 N.E.3d 1112, 1119 (Ill. 2018) (internal quotation marks omitted). At the same time, the economic loss doctrine does not bar recovery where "the defendant owes a duty in tort to prevent precisely the type of harm, economic or not, that occurred." *2314 Lincoln Park W. Condo. Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 555 N.E.2d 346, 352 (Ill. 1990). Such is the case for Fehrenbacher's defamation claim, since "the economic harm caused by [UHC] to [Fehrenbacher's] reputation is exactly that which [UHC] is under a duty in tort to prevent." *Voyles v. Sandia Mortg. Corp.*, 724 N.E.2d 1276, 1284 (Ill. App. Ct. 2000), *rev'd on other grounds*, 751 N.E.2d 1126 (Ill. 2001). Thus, the economic loss doctrine does not preclude Fehrenbacher from proceeding with his defamation *per se* claim.

### 4. *Statute of Limitations*

Finally, to the extent Fehrenbacher does state a cognizable claim of defamation *per se*, UHC contends that the claim must still be dismissed as time-barred. A defamation claim is subject to a one-year statute of limitations in Illinois. 735 ILCS 5/13-201. Normally, a plaintiff's complaint need not anticipate an affirmative defense such as the statute of limitations to survive a motion to dismiss. *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). "The exception

13

occurs where . . . the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint plainly reveals that an action is untimely under the governing statute of limitations." *Id.*

According to UHC, the complaint's allegations definitively establish that this action was filed after the statute of limitations had run on Fehrenbacher's defamation claim. UHC argues that the complaint alleges that the acts giving rise to Fehrenbacher's defamation claim occurred in late 2022 but the complaint was not filed until May 8, 2024, more than a year after the alleged misconduct. As an initial matter, the Court notes that UHC mischaracterizes the allegations in suggesting that any part of the defamation claim was based on acts occurring in 2022. Rather, the complaint alleges that Fehrenbacher learned in "the latter part of 2022" that UHC had been improperly soliciting his clients, which set in motion the events that led UHC to purportedly retaliate against Fehrenbacher by issuing the defamatory statements accusing him of forgery. But the complaint then makes clear that UHC issued those statements in 2023. While UHC tries to fault Plaintiffs for failing to plead that UHC made the alleged defamatory communications after May 9, 2023 (*i.e.*, within a year of his filing the complaint), that argument ignores the fact that a plaintiff need not plead around an affirmative defense.

Even if the complaint alleged that UHC committed the defamation prior to May 9, 2023, there may yet be an applicable tolling doctrine that could save the claim from being time-barred. For example, if UHC issued the statements about Fehrenbacher to the state agencies prior to May 9, 2023, but Fehrenbacher was unable to learn about those statements until after May 9, 2023, Fehrenbacher could potentially show that the discovery rule applies to delay the accrual of his defamation claim to that later date. *See Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 435 (7th Cir. 2009) ("Under certain circumstances, namely when a publication was 'hidden, inherently

14

undiscoverable, or inherently unknowable,' Illinois courts apply the 'discovery rule' such that the statute of limitations does not accrue until the plaintiff knew or should have known of the defamatory report." (quoting *Blair v. Nev. Landing P'ship*, 859 N.E.2d 1188, 1195 (Ill. App. Ct. 2006))). In short, the complaint comes nowhere close to definitively establishing that the statute of limitations has run on Fehrenbacher's defamation claim. And because each of UHC's arguments against that claim has proved unavailing, the Court denies UHC's motion to dismiss Fehrenbacher's claim of defamation *per se*.

II. **Motion for Leave to Amend and to Vacate Stay of Discovery**

During the pendency of UHC's motion to dismiss, Plaintiffs moved for leave to file an FAC and to vacate the stay of discovery put in place pending the Court's ruling on the motion to dismiss. While the Court understands that many of the proposed FAC's allegations are meant to respond to and moot Defendants' arguments for dismissal, the proposed FAC also asserts two new claims for tortious interference with a prospective business expectancy and tortious interference with contract. Thus, the Court assumes that Plaintiffs still wish to proceed on the proposed FAC notwithstanding the Court's conclusion that the claims in the original complaint were adequately pleaded. Because UHC's arguments as to the futility of granting leave to amend are the same as its arguments for dismissal of the original complaint, the Court sees no reason not to allow Plaintiffs to file their FAC if they wish. Further, the Court grants Plaintiffs' request to lift the stay of discovery in light of its denial of UHC's motion to dismiss.

## CONCLUSION

For the foregoing reasons, UHC's motion to dismiss (Dkt. No. 8) is denied and Plaintiffs' motion for leave to file an FAC and to vacate the stay of discovery (Dkt. No. 22) is granted.

ENTERED:

Dated: June 5, 2025

_____
Andrea R. Wood
United States District Judge